Joseph Addison ANYAN, Jr., Plaintiff,

v.

**NEW YORK LIFE INSURANCE CO., et al., Defendants.**

**No. 00 Civ.8757(DC).**

United States District Court, S.D. New York.

April 3, 2002.

McMickens & Ellis, L.L.P., By: Jacqueline McMickens, Brooklyn, New York, for Plaintiff.

Pillsbury Winthrop, L.L.P., By: Kristan Peters, Nancy Merwin, David Lagasse, Stamford, Connecticut, for Defendants.

## *OPINION*

CHIN, District Judge.

Plaintiff Joseph Anyan sold insurance products for defendant New York Life Insurance Company ("New York Life") from 1980 through 1999, when his contract with New York Life was terminated. Anyan alleges that defendants discriminated against him on the basis of his race and color, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("section 1981"), and his disability, namely, diabetes, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12102 *et seq.* (the "ADA"). Anyan also brings claims under the New York State Human Rights Law (the "NYHRL"), N.Y. Exec. Law § 296 *et seq.* (McKinney 2001).

Defendants move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, asserting that (i) plaintiff was not an employee within the meaning of the statutes, and (ii) even assuming that he was an employee, he was dismissed for failing to meet New York Life's production standards and not for any discriminatory reason. As set forth below, a reasonable jury could only conclude that Anyan was an independent contractor rather than an employee. Moreover, no reasonable jury could find that defendants discharged plaintiff because of his race or disability. Therefore, defendants' motion is granted and the complaint is dismissed.

## BACKGROUND

### I. The Facts

For purposes of this motion, the facts attested to by plaintiff are assumed to be true and all conflicts in the evidence have been resolved in his favor.

### A. Plaintiff's Contract With New York Life

There are two types of agents at New York Life: Training Allowance Subsidy Agents, or "TAS agents," and "Established Agents." (Decl. of Margaret Anderson–Miller at ¶ 2).[1] TAS agents are individuals who have been affiliated with the company for less than three years and are considered New York Life employees. (*Id.* at ¶ 3). After three years, TAS agents are deemed fully trained and become Established Agents. (*Id.* at ¶ 3). Established Agents are treated as independent contractors, and must produce a certain level of sales to maintain their contracts. (*Id.* at ¶¶ 4–5).

Plaintiff signed an "Apprentice Field Underwriter's Agreement" on August 25, 1980, which provided a salary of $600.00 per month. (Pl.Ex. 31). The Agreement states that it "shall commence on the effective date stated above and terminate at the end of the third Contract Year, as defined in this Agreement, or earlier in accordance with its provisions." While the August 25, 1980 Agreement was in effect, plaintiff was considered a New York Life employee, "subject to its direction and control," and was obligated to "diligently study the NYLIC Training Courses, fulfill the Company's requirements in connection therewith, comply with any other educational and training requirements of the Compa-ny, and keep such records and make such reports as may be required." (*Id.*).

Apparently, it did not take plaintiff three years to learn how to be an agent, because he signed an "Agent's Contract" on October 5, 1981. (Pl.Ex. 33). Paragraph 5 of that contract states:

> [N]either the term 'agent,' used in this contract solely for convenience in designating one of the parties, nor anything contained in this contract or in any of the rules or regulations of the corporation, shall be construed as creating the relationship of employer or employer and employee between the corporation and the agent.

(Pl.Ex. 33; *see* Pl. Dep. Tr. at 35, 62, 123).

In 1983, plaintiff signed a "Registered Representative's Agreement" enabling him to solicit applications for the New York Life Variable Contracts Corporation ("VCC") in addition to New York Life. (Pl.Ex. 35). The Registered Representative's Agreement provided that plaintiff's Agent's Contract "shall continue in full force and effect according to [its] terms and nothing herein shall be construed as relieving the agents from responsibilities under such contracts." (*Id.*). The Registered Representative's Agreement also stated that in agreeing to submit to the supervision of VCC "the agent will, nevertheless, be considered to be and act at all times as an independent contractor under contract with the VCC, the Company and NYLIAC and not as an employee of either VCC, the Company, or NYLIAC, except that nothing in this Agreement shall be considered as altering the relationship of an agent designated as an employee as a result of any applicable training allowance agreements." (*Id.*).

---

**1.** Plaintiff argues that "the declarations of Celestina Daedze, Darin Fass, Kenneth Hankinson, Sofia C. Magrath and Margaret Anderson–Miller failed to meet the require-ment of Rule 56(e) because they are hearsay and fall within none of the hearsay exceptions." (Pl. Mem. at 4–5). The objection is overruled.

After 1983, New York Life did not withhold any state, local, or federal income taxes from plaintiff. (Pl. Dep. Tr. at 62–3). Plaintiff acknowledges that commissions were "the only thing we [we]re paid," except for a fluctuating monthly paycheck based on previous policies. (*Id.* at 63).

Plaintiff's contract did not require him to work at New York Life's offices and he was not required to work a 40–hour week. (*Id.* at 47, 56). Plaintiff did receive referrals and projects from New York Life, but he could refuse those projects at any time. (*Id.* at 54–6). Plaintiff did not have paid vacation, holidays, or sick leave. (*Id.* at 47–48). From 1996 until 1999 plaintiff rented space from New York Life. (*Id.* at 53). Prior to 1996 plaintiff shared an office at New York Life's corporate offices. (*Id.*). During his entire career as an agent, he had to pay for his own telephone expenses, postage, stationery, office supplies, computer, business cards, and travel expenses. (*Id.* at 48–52). He also paid an equipment charge for photocopying. (*Id.* at 48). New York Life did not place any prohibitions on plaintiff's ability to hire a secretary or other clerical assistants, and plaintiff used temporary workers without getting clearance from New York Life. (*Id.* at 57, 61).

### B. *Plaintiff's Diabetes*

Plaintiff developed diabetes in 1996. Plaintiff believes that his diabetes developed due to the stress of a class action suit in which he was named a defendant. (*Id.* at 104). While plaintiff's physician has not linked the diabetes to the lawsuit, he did say that it was related to the stress of plaintiff's job. (*Id.* at 104). On March 28, 1997, plaintiff's doctor wrote a note to New York Life describing plaintiff's diabetes. (*Id.* at 106). The note stated:

> Joseph Anyan has been followed in my office for uncontrolled diabetes and hypertension since 11/96. He is currently taking the following medications: Glucotrol XL, two tab daily; Glucophage, 500 milligram, one tab twice daily; Vasotec, 20 milligram, one tab daily.

(Pl.Ex. 41; Pl. Dep. Tr. at 108).

The medication "didn't start controlling everything immediately; it took time." (*Id.* at 107). Plaintiff gave the note to a managing partner for inclusion in his file. Plaintiff "wanted her to know that I am not going to operate on full speed because I can't—I can't travel, from when I had appointments, by the time I go to the train station, I need a bathroom, you know, things like that." (*Id.* at 107). That managing partner left New York Life, but plaintiff believed that "this thing [the note] should have been available to any new managing partner." (Id. at 111). Plaintiff is uncertain whether the next managing partner knew of the note's existence, but the next partner did inquire into plaintiff's health and knew that plaintiff was sick. (*Id.* at 113).

Managing Partner George Gordon ("Gordon"), who plaintiff alleges was primarily responsible for his discharge, was not aware of plaintiff's diabetes before plaintiff's contract was terminated, but plaintiff contends that Gordon "should have known" about plaintiff's diabetes because Gordon's predecessor knew plaintiff was "sick," and because plaintiff applied for an insurance policy and was declined because of his high blood sugar. (Gordon Dep. Tr. at 80, 130; Pl. Dep. Tr. at 115, 170, 243–46). As discussed below, however, Gordon was not transferred to New York until 1999, approximately two years after the doctor's note was written.

Plaintiff's contract with New York Life did make him eligible for a personal incapacity benefit, or "PIC." These PICs "compensate[ ] agents when, because of illness or injury, they are not able to work as a

New York Life agent." (Decl. of Sophia Magrath at ¶ 4). To receive a PIC, the agent must fill out a PIC application form and the agent's physician must complete an attending physician's statement. (*Id.* at ¶ 6). After review, if the agent is approved for a PIC the agent will receive PIC income. According to New York Life's records, plaintiff never applied for a PIC. (*Id.* at ¶ 7).

### C. *The New York Life Production Standard*

To maintain their contracts with New York Life, Established Agents must make a certain amount of sales pursuant to the Contract Maintenance Standard, or "production standard." (Anderson–Miller Decl. at ¶ 5). Established Agents who meet the requisite level of sales are known as "proactive" agents. (*Id.* at ¶ 6). These production standards apply to all agents, and are established and published annually by the agency department. (*Id.* at 7–8).

The production standard for 1998 and 1999 was set at $22,000 in first year commissions ("FYCs"). (*Id.* at 9). An agent who failed to make sufficient sales in 1998 would be placed on quarterly probation in which he would have to meet the "proactive" levels set for the next year and every quarter on a pro-rata basis. (*Id.* at ¶ 8; Pl. Dep. Tr. at 217). Therefore, an agent who did not make $22,000 in FYCs by December 31, 1998 would be placed in probation in early 1999 and be required to produce $5,500 in FYCs in the first quarter of 1999, then $11,000 by the end of the second quarter, then $16,5000 by the end of the third quarter of 1999 and then $22,000 by the end of the fourth quarter of 1999. (Anderson–Miller Decl. at ¶ 9; Pl. Dep. Tr. at 216–19).

### D. *The Termination*

Plaintiff failed to meet the production standards for both 1997 and 1998, but states that the standards were not enforced for those years. (Pl. Dep. Tr. at 215, 223, 258; *but see* Anderson–Miller Dec. at ¶¶ 10, 25). At his deposition, plaintiff attributed his decline in production to the stress of the class action suits in which he was a named defendant and the increased difficulty of selling New York Life products in the face of bad publicity. (Pl. Dep. Tr. at 116–18). Plaintiff also noted that it was the stress of the class action that "triggered" his diabetes. (*Id.* at 118). Plaintiff was informed that he had to comply with the "proactive" level for the first quarter of 1999 by making $5,500 in FYCs or his contract would be terminated. (*Id.* at 218–19, 223). Plaintiff did not meet the 1999 proactive level but his contract was not immediately terminated.

In early 1999 Gordon was transferred from New York Life's Boston General Office to New York City to be Managing Partner of the new Greater New York General Office. (Anderson–Miller Dec. at 12). The Greater New York General Office was composed of four previously separate General Offices that were merged into one large General Office. (*Id.*). To ease the transition from the prior managers to the new management, Gordon obtained permission to declare an "amnesty" for one calendar quarter for all non-proactive agents. (Anderson–Miller Dec. at ¶ 13). Under this "amnesty" program, all agents who were not proactive in 1998 and also failed to meet the 1999 first quarter goal would not have their contracts terminated after March 30, 1999 as scheduled. (*Id.* at ¶ 14, Pl. Dep. Tr. at 219–223).

Plaintiff did not earn the required $11,000 in FYCs by June 30, 1999. (Pl. Dep. Tr. at 227–8). He was granted an extension of his contract, however, because he had a case in underwriting that would bring him into compliance with the produc-

tion standard. (*Id.* at 225). Gordon asked Anderson–Miller to grant this extension. (Gordon Dep. Tr. at 124).

Plaintiff did not earn the required $16,500 of FYCs by September 30, 1999, although he contends that he had policies in underwriting. (Pl. Dep. Tr. at 227, 259). Plaintiff has "no doubt" that he would still be an agent at New York life if he had complied with the production standards. (*Id.* at 246). Vice President Richard Nelson issued a thirty-day notice to plaintiff stating that his contract was terminated effective November 7, 1999, for failure to meet the Contract Maintenance Standard. (Gordon Dep. Tr. at 133–34). This termination was directed by Anderson–Miller, although plaintiff contends that Gordon "could have averted it." (Pl. Dep. Tr. at 246–47). Anderson–Miller states that her decisions regarding plaintiff's contract were made without knowledge of plaintiff's race or medical condition. (Anderson–Miller Decl. at ¶ 21). Anderson–Miller also states that she was never aware of any application for a reasonable accommodation by plaintiff, and that if plaintiff had made such an application, it would have been forwarded to her. (*Id.* at ¶ 22).

### E. *Purported Discrimination at New York Life*

At his deposition, plaintiff stated that "it was easier for the white—young white men to make it ... because they have better connections; they get the best leads from the managers." (Pl. Dep. Tr. at 81). In particular, plaintiff alleged that "George Gordon ... was dishing out leads." (*Id.* at 170). When asked whether any white agents received leads from Gordon, plaintiff named one agent, but he could not say how many leads were given to that agent, provide the dates the leads were given, state how much the leads were worth, or say with certainty how he knew that the

agent received leads from Gordon. (*Id.* at 82–4). When asked "on what do you base that statement [the allegation that the white agent received leads from Gordon]," plaintiff replied "because that's how it's been done." (*Id.* at 82). Plaintiff also acknowledged that Gordon gave leads to at least one African–American agent, Celestina Dadzie. (*Id.* at 94–95). At Gordon's deposition, he said that when "orphan" leads were assigned, they were assigned according to company rules requiring that orphan leads could only be given to proactive agents. (Gordon Dep. Tr. at 125). Plaintiff said:

A: ... The new white agents can pick up quickly.

Q: Why is that?

A: Well, because people listen to them more.

Q Who listens to them more?

A The public.

Q: Why?

A: Because the white agents can sell to both whites and blacks, but I have difficulty convincing a lot of whites and have difficulty convincing blacks.

Q: Who has difficulty?

A: Me, compared to a white agent.

Q: Why is that?

A: Black people, mostly minority people, like doing business with white people.

Q: Why is that?

A: It's natural ...

Q: So you're saying, the reason the production standard is unfair is because the environment outside of New York Life, in the general public, is one in which clients seem to have a preference for white people.

A: Yes.

(*Id.* at 153–4).

According to plaintiff, he was discriminated against because "New York Life should design something that should take into account inequities," but plaintiff also acknowledged that there were New York Life agents of all races. (*Id.* at 80–81, 167).

## II. *Prior Proceedings*

Plaintiff filed a complaint with the Equal Employment Opportunity Commission (the "EEOC") on August 15, 2000, and his right-to-sue letter was mailed on August 25, 2000. (Ex. to Compl.). Plaintiff filed a *pro se* complaint in this Court on November 16, 2000. Plaintiff subsequently amended his complaint on December 4, 2000 and March 29, 2001. Richard E. Nelson and Cassandra Scott were originally named as defendants; they have since been dropped.

■ Plaintiff originally brought claims pursuant to Title VII, 1981, the ADA, the Age Discrimination in Employment Act, 29 U.S.C. § 723(a) (the "ADEA"), and the NYHRL. Plaintiff does not address his ADEA claim in his opposition papers to defendants' motion and presents no specific evidence that age was a factor in the termination of his contract. Therefore, the ADEA claim is considered abandoned and it is dismissed. Moreover, even if the claim had been pressed, the same analysis set forth below would apply and the age claim would be dismissed on the merits.

### DISCUSSION

Defendants move for summary judgment on the grounds that (1) plaintiff was not an employee of New York Life within the meaning of Title VII, the ADA, and the NYHRL, and (2) even assuming plaintiff was an employee, his contract was terminated for a nondiscriminatory reason: he failed to meet the production standard. On the record before the Court, a reasonable jury could only conclude that plaintiff was an independent contractor rather than an employee. Even assuming plaintiff was an employee, no reasonable jury could conclude that defendants discriminated against him on the basis of race or disability. Hence, defendants' motion is granted.

## I. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505; *see Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991).

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 (citation omitted). The nonmoving party "must present 'concrete particulars' and cannot succeed with purely conclusory allegations." *Fitch v. R.J. Reynolds Tobacco Co.*, 675 F.Supp. 133, 136 (S.D.N.Y.1987) (citation omitted). There is no issue for trial unless there

exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. As the Court held in *Anderson,* "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## II. *Independent Contractors*

■ Title VII and the other anti-discrimination employment statutes cover employees, not independent contractors. *Eisenberg v. Advance Relocation & Storage, Inc.,* 237 F.3d 111, 113 (2d Cir.2000) (citations omitted). Therefore, if plaintiff is an independent contractor rather than an employee of New York Life, his employment discrimination claims must be dismissed.[2]

■ The common law of agency determines whether a worker is an employee or an independent contractor. *O'Connor v. Davis,* 126 F.3d 112, 115–16 (2d Cir.1997), *cert. denied,* 522 U.S. 1114, 118 S.Ct. 1048, 140 L.Ed.2d 112 (1998). As the Supreme Court set forth in *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), when determining whether a party is an employee under the common law of agency the Court must consider the hiring party's "right to control the manner and means by which the product is accomplished," as well as other factors, including:

the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

■ In considering these factors, "a court must disregard those factors that, in light of the facts of a particular case are (1) irrelevant or (2) of indeterminate weight" and then analyze the remaining factors. *Eisenberg,* 237 F.3d at 114 (citations omitted).

■ A reasonable jury weighing these factors in this case could only conclude that plaintiff was not an employee within the meaning of the statutes. Admittedly, plaintiff had a long-term relationship with New York Life. Also, plaintiff does present some letters from Gordon and others addressing plaintiff's methods of dealing with clients, suggesting that New York Life enforced some minimal performance standards in addition to the commission quota. (*See* Pl.Ex. E, F, H).

Considering all the factors as a whole, however, a reasonable jury could only conclude that "the balance tips in favor of independent contractor status." *Barnhart v. New York Life Ins. Co.,* 141 F.3d 1310, 1313 (9th Cir.1998). As plaintiff acknowledged in his deposition, plaintiff's Agent's Contract with New York Life provided that he was an independent contractor, not an employee. He was not required to

---

**2.** Section 1981 does, however, apply to situations other than employment, as it provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Hence, plaintiff was covered by section 1981 even if he was not an employee.

work from New York Life's offices, and he was able to refuse any projects assigned to him by New York Life. Plaintiff had complete discretion over his hours, and was able to hire and fire his own assistants. He received no benefits and was not taxed as an employee. He was responsible for his own expenses. Hence, Anyan was not an employee of New York Life for purposes of the employment statutes, as a matter of law.

Plaintiff cites *Ware v. United States*, 67 F.3d 574 (6th Cir.1995), contending that *Ware*'s facts "closely resemble those in the present case." Plaintiff is correct, for the facts of *Ware* are similar. But in *Ware*, the Sixth Circuit held that the agent was an independent contractor rather than an employee—just as plaintiff was an independent contractor for New York Life. In *Ware*, an insurance agent argued that he was an independent contractor of the Automobile Association of America ("AAA") rather than an employee. *Id.* at 575. Indeed, although Ware received some tax benefits from AAA, he did not depend on AAA instructions, he controlled his own assistants, he set his own schedule, paid his own expenses, and he worked entirely on commission. *Id.* at 579.

### III. *The Race Claim*

■ Plaintiff alleges that defendants discharged him because of his race. As-

suming that Anyan was an employee for the purposes of the employment laws, as in any employment discrimination case, the "ultimate issue" is "whether the plaintiff has sustained his burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,'" *i.e.*, that there was discriminatory intent. *Stratton v. Dep't for the Aging*, 132 F.3d 869, 878 (2d Cir.1997) (quotation and citations omitted). Because no reasonable jury could conclude that defendant terminated plaintiff's employment for an impermissible reason, plaintiff's wrongful termination claim is dismissed.

### A. *Applicable Law*

■ Title VII makes it unlawful "for an employer ... to ... discharge any individual ... because of such individual's race." 42 U.S.C. § 2000e–2(a)(1).[3] In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies upon the three-step test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St.*

---

**3.** The same standards apply to a discrimination claim under section 1981 or the NYHRL. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (relating Title VII and section 1981 claims); *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992) (relating Title VII and NYHRL claims); *see also Minton v. Lenox Hill Hosp.*, 160 F.Supp.2d 687, 693, n. 4 (S.D.N.Y.2001). Thus, I analyze the Section 1981 and the NYHRL claims in conjunction with the Title VII claim.

In addition, individual defendants may not be held personally liable for alleged violations of Title VII, the ADA, or the ADEA. *See Suth-*

*erland v. New York State Dep't of Law*, No. 96 Civ. 6935(JFK), 1999 WL 314186, *7 (S.D.N.Y. May 19, 1999); *see also Falbaum v. Pomerantz*, 891 F.Supp. 986 (S.D.N.Y.1995). Under the NYHRL, an employee may be held individually liable if he has "sufficient authority and power to do more than simply carry out personnel decisions made by others." *Chamblee v. Harris & Harris, Inc.*, 154 F.Supp.2d 670, 676–77 (S.D.N.Y.2001). Individuals are also subject to suit under section 1981. The issue of individual liability need not be resolved in this case, in any event, because the claims are dismissed on the merits.

*Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To establish a *prima facie* case of employment discrimination on the basis of race, a plaintiff must show that he (1) is a member of a protected class; (2) who was performing his duties satisfactorily; (3) and was discharged; (4) under circumstances giving rise to an inference of discrimination. *See Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir.2000); *Carr v. Health Ins. Plan of Greater New York, Inc.,* 111 F.Supp.2d 403, 413 (S.D.N.Y.2000). The burden of alleging a *prima facie* case "is a minimal one." *Graham,* 230 F.3d at 38.

Second, if the plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Reeves,* 530 U.S. at 142, 120 S.Ct. 2097; *Cruz,* 202 F.3d at 567; *Minott v. Port Auth. of New York,* 116 F.Supp.2d 513, 519 (S.D.N.Y.2000). "This burden is one of production, not persuasion." *Minott,* 116 F.Supp.2d at 519 (citing *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's,* 509 U.S. at 510–11, 113 S.Ct. 2742 (citation omitted); *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields,* 115 F.3d at 120–21; *Connell v. Consolidated Edison Co.,* 109 F.Supp.2d 202, 207 (S.D.N.Y.2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. It is not sufficient, however, for a plaintiff merely to show that he satisfies *"McDonnell Douglas's* minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James,* 233 F.3d 149, 153. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination on the basis of race. *See id.* at 157; *Connell,* 109 F.Supp.2d at 207–08.

As the Second Circuit observed in *James:* "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.,* 999 F.Supp. 506 (S.D.N.Y.1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination).

### B. *Application*

Here, I assume that plaintiff has made out a prima facie case. Moreover, defendants have articulated a legitimate, nondiscriminatory reason for "discharging" him, namely, that he failed to meet the yearly production standard. Hence, I proceed directly to the ultimate question—whether the record contains sufficient evidence from which a reasonable jury could find discrimination. I evaluate first plaintiff's evidence, then defendants' evidence, and

finally the record as a whole, keeping in mind the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir.1997).

### 1. *Plaintiff's Evidence*

 Plaintiff produces only minimal evidence of discrimination. Plaintiff asserts that: he is African–American, he was an Established Agent for New York Life for nearly twenty years, "leads" were given to white employees but not to him, and New York Life failed to combat societal discrimination, as the result of which it was impossible for him to sell as many contracts as white agents.

The only evidence provided by plaintiff as to the source of leads was his conclusory testimony at his deposition. When asked whether any white agents received leads from Gordon, plaintiff named one agent, but he could not provide the dates of the leads or state how much they were worth. When asked "[o]n what do you base that statement [the allegation that another agent received leads from Gordon]," plaintiff replied "[b]ecause that's how it's been done." Plaintiff did not provide examples of discriminatory comments made by anyone at New York Life—in relation to leads or any other matters. Hence, plaintiff has not offered any concrete, admissible evidence to substantiate his claim of disparate treatment in the giving of "leads."

As for plaintiff's claims about societal inequities, in his opposition papers, he attempts to substantiate his arguments with evidence regarding New York Life's advertising spending. Citing letters from managers of minority-targeted newspapers stating that New York Life had not purchased advertising space from them, plaintiff writes:

NYLIC recognizes the value of advertising in the presentation of its company and service, and makes a significant investment in advertising and therefore enhancing the ability of an Agent to sell their products. Yet in the black communities during the years which are the subject of this action, defendant can only point to one local black, Latino, or Carribean newspaper that had one advertisement that spoke of the service that NYLIC could provide or to extol the value NYLIC products. Defendants have not produced the dollar amount expended advertising in any of the local media which covers the minority community. Johnson Publications, a national magazine syndicate was also excluded.

(Pl. Mem. at 27).

Plaintiff claims that there is not "even a scintilla of evidence to demonstrate that the defendants spent any money creating advertising in the major media which speaks to the minority community such as Ebony Magazine, Essence, or Jet Magazine." (Pl. Mem. at 13).

Even assuming that New York Life did not advertise in magazines or other media targeted at "the minority community," that fact does not constitute evidence that New York Life discriminated against plaintiff. First, plaintiff provides no information as to what extent New York Life advertised in major publications or other mass media, or whether New York Life advertised in other ethnic media, such as, for example, Greek or Russian or Chinese newspapers. Hence, the absence of advertising in certain minority-owned publications proves nothing.

Second, plaintiff has not presented evidence of a causal connection between the alleged lack of advertising in "the minority community" to the decision to terminate his contract. In essence, plaintiff is argu-

ing that if New York Life had advertised more in media targeted at the African–American population, African–Americans would have been more likely to have purchased insurance from New York Life. In turn, plaintiff contends, he would have sold more policies and his sales would have been higher, he would have met the production quotas, and he would not have been discharged. Not only is this argument speculative, it is based on potentially dangerous premises: minority agents cannot perform satisfactorily unless New York Life advertises in media targeted at minority communities, and employers should be liable for intentional discrimination if they fail to advertise in minority communities.

Third, plaintiff apparently met his production quotas for many years. It was only starting in 1997 and 1998 that he failed to do so. Yet, plaintiff does not argue that New York Life changed its advertising practices in 1997, and he makes no effort to explain why the purported lack of advertising in minority media would have affected him starting in 1997 when it had not prevented him from meeting the production quotas before.

 It may be the case that societal inequities exist. But Title VII does not *require* employers to take steps to eliminate those inequities; it requires only that employers refrain from intentional discrimination.

In the end, plaintiff's admissible evidence of discrimination consists solely of the fact that he is African–American and the fact that his contract was terminated. This is hardly sufficient evidence of discrimination to justify putting the issue to the jury.

### 2. Defendants' Evidence

Defendants present substantial evidence to show that plaintiff was "discharged"

because he failed to meet New York Life's production standard. Defendants point to plaintiff's concession at his deposition that he knew about the performance standard and failed to meet it. Defendants also highlight portions of plaintiff's deposition where he acknowledges receiving leads from New York Life managing partners, as well as excerpts of Gordon's deposition discussing the production standards and the circumstances of plaintiff's termination.

In addition, the defendants provide the sworn declarations of Celestina Daedze, Kenneth Hankinson, Darin Fass, Sophia C. Magrath, and Margaret Anderson–Miller, all employees or agents of New York Life. (Def.Ex. B–F). These individuals attest to various aspects of working at New York Life; Hankinson and Daedze describe their experiences as minority agents at New York Life, as well as their experiences working with plaintiff and Gordon. Fass, who is a partner, describes the process by which agents become "Council" members at New York Life. Agents' success in generating commissions is recognized through placement in a "Council." The more FYCs that an agent earns, the higher his Council status will be. Fass notes that in the Council Year ending June 30, 3000, the Greater New York General Office saw 17 African–American agents achieve Council status. (Faze Decl. at ¶ 5). Anderson–Miller discusses the performance standard, in general, as well as plaintiff's failure to comply with it—noting that plaintiff was given many opportunities to improve his performance. (Anderson–Miller Decl. at ¶¶ 10, 23, 24, 25).

### 3. The Record As a Whole

On this record, plaintiff's claim against New York Life and the other defendants cannot stand. Plaintiff has presented virtually no evidence of discrimination and

defendants have presented substantial evidence that they did not discriminate. A reasonable jury could only find against plaintiff on the ultimate issue of discrimination.

## IV. *The Disability Claim*

Plaintiff asserts disability claims under the ADA and the NYHRL. Because the definition of "disability" differs under the two statutes, I discuss the statutes separately.

### A. *The ADA*

#### 1. *Applicable Legal Standards*

The ADA prohibits employment discrimination against individuals with disabilities and provides that:

> [n]o [employer covered by the ADA] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a); *see also Buckley v. Consolidated Edison, Co.*, 155 F.3d 150, 153–54 (2d Cir.1998). The ADA's definition of "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer's] business." *Lyons v. Legal Aid Society*, 68 F.3d 1512, 1514 (2d Cir. 1995) (quoting 42 U.S.C. § 12112(b)(5)(A)).

▮▮ Under the ADA, a "disability" includes: (1) a physical or mental impairment that substantially limits a major life activity; (2) a record of such an impair-

ment; or (3) a perceived impairment. 42 U.S.C. § 12102(2). Not every physical or mental impairment is considered substantially limiting; "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 691, 151 L.Ed.2d 615 (2002).

▮▮ To state a claim under the ADA, plaintiff must show that: "(1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired because of his disability." *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 149–50 (citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir.1998)).

▮▮ The existence of a disability is to be made on a case-by-case basis. *See Toyota*, 122 S.Ct. at 685 ("that the Act defines 'disability' 'with respect to an individual,' § 12102(2), makes clear that Congress intended the existence of a disability to be determined in [such] a case-by-case manner") (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)). The argument that diabetes restricts the major life activity of employment because it causes frequent urination has been rejected by at least one court in the Second Circuit. *See Williams v. H.N.S. Mgmt. Co.*, 56 F.Supp.2d 215, 221 (D.Conn.1999). In some cases, courts have held diabetes to be a substantial impairment; again, the determination is to be made on a case-by-case basis, examining not only the impairment, but the effect of corrective measures

such as medication. *See Gonsalves v. J.F. Fredericks Tool Co., Inc.,* 964 F.Supp. 616, 621 (D.Conn.1997) ("Courts have acknowledged that diabetes may substantially limit a major life activity."); *but see Moore v. Time Warner GRC 9,* 18 F.Supp.2d 257, 260 (W.D.N.Y.1998).

Before the Supreme Court's ruling in *Sutton,* courts often held that conditions should be evaluated in their non-medicated states. *See Burke v. Royal Ins. Co.,* 39 F.Supp.2d 251, 258–59 (E.D.N.Y.1999). In *Sutton,* however, the Court held that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Sutton,* 527 U.S. at 482, 119 S.Ct. 2139. The Court wrote:

> A 'disability' exists only where an impairment 'substantially limits a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity.

527 U.S. at 482–83, 119 S.Ct. 2139

In *Epstein v. Kalvin–Miller Int'l,* 100 F.Supp.2d 222, 227 (S.D.N.Y.2000), plaintiff had type 2 diabetes, which, if left untreated, would affect his ability to walk. The court held, however, that because plaintiff's diabetes did not affect his ability to walk when treated, "after *Sutton,* there is no question that plaintiff's diabetes *does not* constitute a disability under the ADA." *Id.* at 227; *see also Rivera v. Apple Industrial Corp.,* 148 F.Supp.2d 202, 213 (E.D.N.Y.2001) ("[A] court must make reference to corrective measures.").

## 2. *Application*

New York Life does not contest that it is subject to the ADA, and plaintiff has shown that he has a physical impairment. *See, e.g.,* 29 C.F.R. § 1630.2(h)(1). Plaintiff's claim fails, however, because he has not presented evidence from which a jury could reasonably find that he suffered from a disability within the meaning of the ADA. In particular, plaintiff has failed to present evidence to show that his diabetes substantially limited one or more major life activities.

Plaintiff testified at his deposition that, because of his diabetes, he could not "operate on full speed." He did not claim he was entirely prohibited from traveling; he said that he required more time when traveling because of a need to stop at bathrooms more frequently. Plaintiff's medication "didn't start controlling everything immediately; it took time." Plaintiff does not state on what date the medication did start to "control everything," but one can infer from this statement that it did, eventually, control his diabetes. Therefore, he does not have a disability for purposes of the ADA.

Plaintiff cites *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 871 (2d Cir.1998), in support of his arguments, generally, and for the proposition that "the ability to control one's elimination of waste is a major life activity." Neither use of *Ryan* is correct. First, in *Ryan* the plaintiff suffered from colitis so severe that it caused "frequent and painful diarrhea, stomach cramps, and rectal bleeding" and during at least one cycle of the illness "if she could not get to a bathroom within five to ten seconds of an attack she would soil her clothes." *Id.* at 868. In this case, plaintiff's only allegation is that his frequent urination sometimes slowed him down.

Second, the Second Circuit did not hold that "the ability to control one's elimination of waste is a major life activity," as plaintiff asserts. Rather, the Second Circuit assumed "without deciding, that the ability to control one's elimination of waste is a major life activity." *Id.* at 871. The Second Circuit ultimately held that the plaintiff in *Ryan* failed to show that the ability to control her elimination of waste was substantially limited by her colitis, despite the severity of her symptoms, because it was asymptomatic for long periods of time. *Id.* at 872–73.

■■■ As in *Ryan,* to the extent that plaintiff's diabetes caused problems for him, the problems were temporary. In plaintiff's words, the medication "didn't start controlling everything immediately; it took time." A disability under the ADA " 'does not include temporary medical conditions, even if those conditions require extended leaves of absence from work' because such conditions are not substantially limiting." *Huskins v. Pepsi Cola of Odgensburg Bottlers, Inc.,* 180 F.Supp.2d 347, 352 (N.D.N.Y.2001) (quotation omitted). The Second Circuit has repeatedly found that temporary injuries requiring claimants to take a few months off from work are "too short [in] duration to be 'substantially limiting.' " *Adams v. Citizens Advice Bureau,* 187 F.3d 315, 316–17 (2d Cir.1999) (quoting *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 646 (2d Cir.1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999)). In this case, plaintiff has not alleged that he was required to take any time off from work whatsoever.

In short, while some diabetics may be significantly limited in their life activities even with medication, plaintiff has provided no evidence from which a reasonable jury could find that he falls into that category. Therefore, plaintiff's ADA claim must be dismissed.

## B. *The NYHRL*

### 1. *Applicable Legal Standards*

■■■ "The NYHRL definition of disability is significantly broader than the ADA definition." *Epstein,* 100 F.Supp.2d at 230. Under the NYHRL, "disabilities are not limited to physical or mental impairments, but may also include 'medical' impairments.... [T]o qualify as a disability, the condition may manifest itself in one of two ways: (1) by preventing the exercise of a normal bodily function or (2) by being 'demonstrable by medically accepted clinical or laboratory diagnostic techniques.' " *State Div. of Human Rights of McDermott v. Xerox,* 65 N.Y.2d 213, 491 N.Y.S.2d 106, 109, 480 N.E.2d 695 (1985) (quoting N.Y. Exec. Law § 292(21)); *see also Reeves v. Johnson,* 140 F.3d at 154.

■■■ To state a prima facie case under the NYHRL, the plaintiff must establish that "(1) [he] suffers from a disability as that term is defined under the statute, and (2) that the disability caused the behavior for which [he] was terminated." *Guzman v. ARC XVI Inwood, Inc.,* No. 97 Civ. 0031(THK) 1999 WL 178786 (S.D.N.Y. March 30, 1999) (citing *McEniry v. Landi,* 84 N.Y.2d 554, 558, 620 N.Y.S.2d 328, 644 N.E.2d 1019 (1994)); *see, e.g., Posner v. Marcus & Millichap Corporate Real Estate Servs.,* 180 F.Supp.2d 529 (S.D.N.Y. 2002). Discrimination claims brought under the NYHRL are generally analyzed using the *McDonnell Douglas* framework employed in Title VII cases, *see Dais v. Lane Bryant, Inc.,* 168 F.Supp.2d 62, 71 (S.D.N.Y.2001), but an adjustment must be made, of course, because of the concept of reasonable accommodation.

If a plaintiff is, indeed, disabled, within the meaning of the NYHRL, it is "an

unlawful discriminatory practice for an employer, licensing agency, employment agency or labor organization to refuse to provide reasonable accommodations to the known disabilities of an employee, prospective employee or member in connection with a job or occupation sought." N.Y. Exec. Law § 296(3)(a) (McKinney 2001); see, e.g., Gronne v. Apple Bank for Savings, No. 98 Civ. 6091(JS), 2000 WL 298914 (E.D.N.Y. Feb.14, 2000), aff'd, 2001 WL 30647 (2d Cir. Jan.12, 2001). A "reasonable accommodation" is an action taken that permits a disabled employee "to perform in a reasonable manner the activities involved in the job … sought or held and include, but are not limited to, provision of an accessible worksite, acquisition or modification of equipment, support services for persons with impaired hearing or vision, job restructuring and modified work schedules; provided, however, that such actions do not impose an undue hardship on the business." N.Y. Exec. Law § 292(21–e).

### 2. *Application*

█ Plaintiff's diabetes, even as treated, constitutes a "medical" disability under the NYHRL because it is demonstrable by medically accepted techniques. *See Epstein* at 229–30. As discussed above, NYHRL claims are evaluated using the *McDonnell Douglas* framework. Therefore, I will proceed directly to the ultimate question—whether the record contains sufficient evidence from which a reasonable jury could find discrimination.

First, plaintiff has presented little, if any evidence that New York Life discriminated against him because of his diabetes. Plaintiff has not presented concrete evidence to show that the decisionmakers even knew of his disability. Plaintiff has produced a note from his doctor discussing his diabetes and medications that he gave

to one of the managing partners at New York Life in 1997. Plaintiff acknowledges that he did not give the note to Gordon, who did not come onto the scene until 1999, but speculates that Gordon's predecessor might have known about the note and might have known that plaintiff was sick. Plaintiff also asserts that his application (and subsequent rejection) for an insurance policy would have alerted New York Life to his diabetes. In contrast, Anderson–Miller states under oath that she was unaware of plaintiff's diabetes, and that any request for an accommodation would have been forwarded to her. Nonetheless, I assume for purposes of this motion that Gordon and New York Life were on notice of plaintiff's diabetes.

Even assuming that New York Life was aware of plaintiff's condition, however, there is no evidence to indicate that plaintiff was discharged because of it or because of misperceptions regarding his condition. Plaintiff does not refer to any statements made by New York Life employees regarding his disability or disabled persons in general, and produces no other evidence from which a jury could find that he was treated any differently from any other Established Agent because of his disability.

Second, as reviewed above, New York Life has presented substantial uncontested evidence that plaintiff did not meet his production standards. Indeed, New York Life has presented substantial evidence to show that it dismissed plaintiff for legitimate business reasons. As discussed above, a reasonable jury could only conclude that plaintiff was discharged because he repeatedly failed to meet the production standard.

█ The sole issue that remains is whether plaintiff should have been granted a reasonable accommodation. Here, assuming the disability was known, there is no evidence from which a jury could find

that plaintiff requested any type of reasonable accommodation. Plaintiff did not apply for a PIC, and he does not describe any other efforts on his part to have his diabetes accommodated by New York Life. A claim of disability discrimination arising from discharge of an employee based on failure to accommodate is not made out unless the employee's request for a reasonable accommodation has been denied by the employer. *Mazza v. Bratton,* 108 F.Supp.2d 167, 176 (E.D.N.Y.2000). Hence, in this case, where there was no request by the plaintiff, there is no claim.

Moreover, the evidence demonstrates that even though New York Life was not asked to provide plaintiff with a reasonable accommodation because of his diabetes, New York Life effectively granted plaintiff an accommodation anyway. Plaintiff did not meet the production standards for 1997 or 1998, when the standards apparently were not enforced. He did not meet the quota in the first quarter of 1999, but was granted an extension under an "amnesty" program. He still did not meet his quota in the second quarter of 1999, but was granted yet another extension. It was only after he failed to meet his quota again, in the third quarter, after plaintiff had failed to meet his quota for almost three years, that his contract was terminated. Hence, New York Life gave him every opportunity to improve his production. He did not.

### CONCLUSION

For the reasons stated above, defendants' motion is granted as to all claims and the complaint is dismissed, with prejudice. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.