INTERNATIONAL GATEWAY EX-
CHANGE, LLC, the assignee to IGE
Inc. (a Florida corporation), Plaintiff,

v.

WESTERN UNION FINANCIAL
SERVICES, INC.,
Defendant.

No. 02 CIV. 6125(CM).

United States District Court,
S.D. New York.

June 25, 2004.

Richard Weiss, New Rochelle, NY, for Plaintiff and Counter Defendant.

Marc E. Elovitz, Schulte, Roth & Zabel, L.L.P., New York City, for Defendant and Counter Claimant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION TO AMEND PRE–TRIAL ORDER

MCMAHON, District Judge.

This is a breach of contract case about the performance by two parties to a service agreement. Plaintiff IGE started a business to allow consumers to purchase and use "stored value cards" at automated teller machines and retail locations. Pursuant to a service agreement (the "Agreement"), dated August 16, 2001, IGE contracted with Western Union to allow people who purchased its stored value cards to send money to an IGE bank account. The consumers could then use their cards to make purchases at retail locations or to withdraw funds from ATMs. The funds deposited by consumers in IGE's bank account were to be used to pay the ATM and retail merchants. IGE earned a fee for providing these services.

IGE indisputably failed to make minimum monthly payments owed to Western Union under the Agreement. It also did not comply with Western Union's demand that IGE obtain various licenses, which Western Union assigns as a breach of the Agreement. Western Union terminated the Agreement on July 16, 2002.

IGE then filed this suit against Western Union, alleging that its business was destroyed by various breaches of contract committed by Western Union and its wrongful termination of the Agreement.

Western Union has asserted a breach of contract counterclaim based on IGE's failure to make the required payments to Western Union and failure to comply with applicable laws.

Throughout the course of this action IGE has represented that it seeks consequential damages, even though this Court held, in a November 22, 2002 Memorandum Decision and Order, that consequential damages are not contemplated, and indeed are expressly disallowed, by the Agreement. One ground for Western Union's motion for summary judgment is that the damages IGE seeks to recover are not contemplated by the Agreement. In response to the motion, IGE belatedly seeks leave to amend its complaint to assert a new theory of damages.

After reviewing the evidence, I conclude that Western Union's motion for summary judgment dismissing the complaint should be granted, as should its motion for summary judgment of liability on its counterclaim. IGE submits no admissible evidence that Western Union materially breached the Agreement, and even considering the inadmissible hearsay evidence offered by plaintiff, no reasonable trier of fact could so find. Nor has IGE shown, with admissible evidence, that Western Union breached the Agreement by purportedly delaying approval of advertising materials. And even if plaintiff had raised a genuine issue of fact concerning liability, the damages sought by IGE are not recoverable under New York law because they were not within the contemplation of the parties at the time the contract was formed.

Western Union, by contrast, has offered admissible evidence tending to show that IGE breached the Agreement by failing, without justification, to make required payments to Western Union, and by failing to comply with applicable banking and consumer protection laws. IGE has failed to raise an issue of fact on the counterclaims, so Western Union is entitled to summary judgment of liability on its breach of contract counterclaim. The matter will be set down for an inquest on damages.

The motion for leave to amend the pretrial order is denied as moot.

## STATEMENT OF FACTS

The following facts are undisputed.

### 1. The Parties

IGE was a Florida corporation with offices in Florida and New York. (Amended Complaint ("Am.Compl.") attached as Exhibit A to the Affirmation of Stacy P. Aronowitz, dated November 21, 2003 (referenced hereinafter as "Ex. ___") at ¶ 1.) The business of IGE involved owning, developing, producing, distributing and marketing stored-value payment cards. (Reply and Affirmative Defenses (hereinafter "Reply") (Ex. B) ¶ 3.) IGE had a system that permitted an individual's funds to be credited to an IGE account at a bank. Those funds could be accessed by pre-encoded cards at automated teller machines and commercial business locations. (Am.Compl.¶ 8.) IGE's cards were intended to be sold throughout the United States. (IGE 30(b)(6) Tr. (Ex. E), at 39.)

Western Union is a Colorado corporation in the business of providing money transmission and payment and messaging services. (Affidavit of Keith Diveley, sworn to November 13, 2003 (hereinafter "Diveley Aff.") ¶¶ 2–3.) There are more than 150,000 Western Union agent locations ("Agents") in over 190 countries and territories worldwide. (*Id.* ¶¶ 3–4.) The Agents include supermarkets, drug stores, gas stations, travel agents and a wide variety of individually-owned small businesses. (*Id.* ¶ 5.) Many Agents have more than one

employee, each of whom may interact with customers and process the requested Western Union transactions. (*Id.*)

The Agents offer a range of different Western Union services to meet different needs, such as making a monthly bill payment or transferring money to a relative. Different services have different fees associated with them and different commissions to Agents, starting at as little as less than 40 cents. (*Id.* ¶ 6.) In addition to commissions, Western Union services at the Agent locations increase store traffic and thereby assist Agents in generating customers for their other services and products. (*Id.*) The Agents are contractually obligated to accept all forms of Western Union payment methods, including the "Quick Collect" service (which allows customers to make last minute bill payments without paying for overnight mail) and the "SwiftPay" service. (*Id.*)

The SwiftPay service was begun in August 1999. (*Id.* ¶ 8.) Consumers use SwiftPay to make recurring payments to companies that subscribe to the SwiftPay service ("subscribers"), such as certain cellular phone plans, at Western Union Agents. In 2002, the year IGE's program was in existence, there were approximately 136 SwiftPay subscribers, which together accounted for an average of 120,000 transactions at Western Union Agents per month. (*Id.* ¶ 10.) New subscribers have been added to the SwiftPay program each year since it came into existence. There are presently 230 SwiftPay subscribers, including companies such as AT & T Wireless and Sprint PCS. (*Id.* ¶ 8.) The average number of SwiftPay transactions per month is approximately 170,000. (*Id.*) All SwiftPay transactions—no matter who the subscriber is—are processed by Agents the same way. (*Id.* ¶ 16.)

## 2. The Agreement

Western Union and IGE entered into the Agreement as of August 16, 2001, to make the SwiftPay service available to IGE's cardholders. (Agreement (Ex. C), p. 1 ¶ E.) Under the Agreement, cardholders would pay a fee every time they made a payment of money to IGE using Swift-Pay, and that fee would be shared between Western Union and IGE. (*Id.* at Schedule A.) IGE also had a schedule of other fees to deduct from the cardholders' funds (P02791 (Ex. D), Cardholder Agreement and Disclosure), and IGE was required under the Agreement to make certain minimum monthly payments to Western Union. (Agreement § 3.1.) As a SwiftPay subscriber, IGE also agreed, *inter alia*, (1) to refrain from using Western Union's name or marks in advertising without Western Union's approval; (2) to comply with all applicable banking and consumer protection laws; and (3) that neither Western Union nor IGE would have any liability for special, indirect, incidental or consequential damages. (Agreement §§ 4.7, 4.9, 5.4, 10.1 & 10.2.)

IGE was a new business putting out a new product, and lacked any history of performance or results. (IGE 30(b)(6) Tr. (Ex. E), at 211:18–20; *see also* Colasuonno Tr. (Ex. F), at 114:9–13 (confirming that card was "unique").) IGE testified that during the time of the Agreement there were no similar cards on the market. (IGE 30(b)(6) Tr. (Ex. E), at 211:5–17.) IGE's then-CFO and current CEO, Philip Colasuonno, confirmed that IGE was the only company with this type of product, and thus no other company could provide an adequate comparison for evaluating IGE's projected damages. (Colasuonno Tr. (Ex. F), at 113:25–114:13; 116:2–7.) IGE's former COO and co-founder, Carmine Rossillo, testified that stored value cards were a new product (Rossillo Tr.

(Ex. G), at 23:10–17; 23:22–24:2; 47:19–25), and thus they were "going to have to take time in the stores, it wasn't just going to go in the stores and sell [ ] the next day." (*Id.* at 24:12–14.) He also conceded that a stored value card product similar to IGE's card had failed prior to IGE's launch (*id.* at 28:24–29:5), and noted that neither IGE's management nor its distributors had experience with stored value cards. (*Id.* at 23:4–12; 29:21–25; 47:17–25.)

Pursuant to the Agreement, IGE joined as a SwiftPay subscriber, allowing its cardholders to make payments to IGE at Western Union Agent locations. (Agreement, p. 1 ¶ E.) When a new company joins SwiftPay as a subscriber, that company and Western Union work together to integrate the company into the SwiftPay system. (Diveley Aff. ¶ 11.) For example, establishing the necessary computer interfaces between the subscriber, the subscriber's bank, and Western Union takes time and resources and requires adjustments as the program operates. (*Id.*) In the case of IGE, the various computer systems needed to be integrated to ensure that cardholder and payment information was accurately and timely communicated to IGE and the bank where IGE held its cardholders' funds. (*Id.*) This required a significant investment by Western Union in terms of technical and personnel resources. (*Id.*)

Western Union trains and communicates with its Agents and their employees through a variety of mechanisms, including the Agent Information Package, "AIP", which is a monthly information magazine published by Western Union to its Agents. (Diveley Tr. (Ex. H), at 9:8–16; Diveley Aff. ¶ 12.) AIP contains important information for the Agents and their employees about their responsibilities, as well as about new services. The magazine is sent to every Agent every month. (*Id.* ¶ 12.)

Western Union also ensures that its Agents are aware of important pieces of information by communicating through electronic bulletins or screen messages that appear when an Agent dials in or logs on to the computer system. (Diveley Tr. (Ex. H), at 9:17–10:2, 11:4–7; Diveley Aff. ¶ 13; Affidavit of Robert Drab, sworn to November 12, 2003 (hereinafter "Drab Aff.") ¶ 11.) Thus, for example, Western Union composed and sent computer messages to its Agents regarding IGE's program (Diveley Aff. ¶ 20; WU 2663–64, 2671–72 (Ex. I), screen messages; P00446–47, 452–54 (Ex. J), December 18 and 21, 2001 e-mail chains), and also put information about IGE's program in AIP, the monthly magazine. (Diveley Aff. ¶ 12; Drab Aff. ¶ 11; Drab Tr. (Ex. K), at 23:18–25:12; 27:7–28:8.)

Western Union has a Customer Service Department ("Customer Service") that assists Agents, customers and subscribers and operates 24 hours a day, 365 days a year. (Diveley Aff. ¶ 15.) Customer Service representatives receive extensive training to answer questions regarding all of Western Union's services. (*Id.*) With almost 40,000 independently-owned and operated Agents all over the United States, Customer Service must address the range of questions that may arise throughout the country. For example, there is a Customer Service Manual addressing the SwiftPay service, including detailed instructions about numerous possible questions that could arise. (*Id.*) There is also a list of the companies that subscribe to SwiftPay, and how Customer Service can get in touch with the subscriber, if necessary. (Diveley Aff. ¶ 15; WU 2635–57 (Ex. L), SwiftPay Customer Relations Manual, dated March 2002; WU 2658–62 (Ex. M) manual for Western Union customer service training.)

### 3. IGE Loses Its Distributor

Before entering into the Agreement with IGE, IGE had a distribution contract with Union Telecard Alliance ("UTA"), a company that had over 300,000 points of distribution for prepaid phone cards and similar products. Western Union was aware of this contract, and believed that the success of the IGE program depended upon a broad distribution network such as UTA's.(Diveley Aff. ¶ 17.)

After the Agreement was signed in August 2001, the parties began setting up their various systems, and the program began accepting customers' funds in December 2001. (P00446–47, 452–54 (Ex. N), December 18 and 21, 2001 e-mail chains). Few such transactions took place during the next few weeks, and Western Union repeatedly asked IGE about this low volume. (Diveley Aff. ¶ 18.) IGE finally admitted that the distribution contract with UTA had expired in November 2001 and UTA had not renewed the contract. IGE thus lost the main distributor of its cards just before beginning its dealings with Western Union. (Diveley Aff. ¶ 18; P00493–99 (Ex. O), IGE and Union Telecard Alliance Contract, terminating 11/17/01, ¶ 1.) Having represented to Western Union that it would sell over a million cards during its first year, IGE registered only 1,174 cards during the term the contract was in force. (P01905–67 (Ex. AAA), IGE Business Plan at 1960; WU 2090 (Ex. P), June 7, 2002 e-mail from J. Leonard to B. Drab.)

On or about April 4, 2002, IGE entered into a contract with an enterprise called IBEX for distribution of its CashCard. (Cplt.Ex. 4). The IBEX Agreement was revised on or about July 2, 2002.

### 4. IGE's Compliance with Banking and Consumer Protection Laws

In the Agreement, IGE represented and warranted that no authorization or approval or other action by governmental authority or regulatory body was required for IGE to perform under the Agreement. (Agreement § 5.4.) A further condition of the Agreement was that IGE must also "comply in all material respects with all banking and consumer protection laws and regulations..." (*Id.* § 4.9.) IGE had the option to suspend the effective date of the Agreement, and thereby suspend its obligation to make the minimum payments, while addressing any regulatory issues. (*Id.* § 5.4.)

During the months leading up to the effective date of the Agreement, Western Union repeatedly notified IGE that IGE needed to obtain necessary licensing or take other steps to comply with applicable laws. After September 11, the passage of the USA Patriot Act on October 26, 2001 created new requirements for entities involved in the receipt and transmission of money. (*See, e.g.,* Bingler Tr. (Ex. Q), at 15:4–7; 20:2–5; 24:2–4; 112:1–10; 129:25–130:9.) The evidence shows that IGE considered these issues as early as September 2001 (BC 1317–19 (Ex. R), September 25, 2001 e-mail from K. Minor to P. Eisenberg), again in December of 2001 (BC 1401–06 (Ex. BBB), January 2, 2002 e-mail chain), and again when Western Union pressed the issue beginning at least as far back as January 2002. (Bingler Tr. (Ex. Q) at 112:1–10; P00518–19 (Ex. S), Howrey & Simon Invoice.) IGE's general counsel discussed these issues extensively with other IGE personnel and with outside attorneys. (*See, e.g.,* Bingler Tr. (Ex. Q), at 15:2–7; 24:1–7; 69:1–3; 72:6–11.)

Because of Western Union's concern that IGE might not be in compliance with applicable laws, Western Union provided IGE with citations to various state statutes and regulations requiring the licensing of the sellers of stored value cards and other

entities that receive and hold funds from consumers. (WU 3133–38 (Ex. T), M. Thompson letter to A. Bingler, dated April 25, 2002.) Western Union also notified IGE of recent regulatory actions in different states, including the regulatory actions against PayPal, Inc.—an unlicenced entity that had been receiving and holding consumer funds (P00137–38 (Ex. U), June 6, 2002 letter from D. Mosher to P. Eisenberg)—and to the laws of other states. (Eisenberg Tr. (Ex. V), at 58:18–25.) Western Union believed that IGE needed to be licensed to receive and hold consumer funds.

Faced with IGE's refusal to obtain licensing, Western Union tried to confirm with the bank where IGE's account was located that the funds on deposit were held in trust for the benefit of the cardholders, as IGE claimed, but the bank refused. (P00126 (Ex. W), April 30, 2002 letter from M. Thompson to A. Bingler.) In truth, the cardholders' funds were received and held in a checking account belonging solely to IGE, called the IGE/Western Union Settlement DDA. It was not a trust account. (Signature Card account 9852803595 (Ex. X).) On two occasions—March 22, 2002 ($89,720.75) and July 18, 2002 ($63,360.18)—funds were transferred from that account into an account controlled by First Bank, known as the FDR Transaction Settlement DDA. The rest of the time the cardholders' funds simply sat in a non-trust account. (Ex. CCC (Phelps Trr.) at 110–21, Ex. DDD)

When IGE sought an analysis of the licensing issues from its outside bank regulatory counsel, its lawyers identified the same serious concerns that Western Union was raising about IGE's lack of licensing. (See, e.g., BC1282–1293 (Ex. Y), May 30, 2002 draft memo from M. D'Amico to A. Bingler.) IGE's General Counsel had a conversation with Sezra Levine, a bank regulatory lawyer, in which she was told that no money transmission license would be needed as long as the funds were help in a trust account. (P00124–25 (Ex. III)). However, as shown above, the funds were not initially deposited into a trust account and were not held in a trust account for long stretches of time. While IGE claimed to Western Union that it did not need to be licensed, neither its general counsel nor its bank regulatory counsel reached that conclusion. (D'Amico Tr. (Ex. Z), at 56:17–19; 61:15–21; Bingler Tr. (Ex. Q) at 68.) Indeed, IGE's counsel advised IGE to seek guidance from the New York State Banking Department on the subject. (Eisenberg Tr. (Ex. V), at 60:6–61:2.) IGE did not follow this advice.

### 5. This Litigation

Although the Agreement was signed in August 2001, and IGE began accepting customer funds in December 2001, IGE was not required to make any monthly payments to Western Union until April 15, 2002. (Agreement Schedule A ¶ 3.) IGE was almost a month late with its second payment, and it never made another payment after that. (May 21, 2002 letter from M. Thompson to A. Bingler (Ex. AA); Answer, Affirmative Defenses and Counterclaim (hereinafter "Answer") (Ex. BB) ¶ 57; Reply (Ex. B) ¶ 22.) IGE failed to make its payments of $272,756.00 due on June 15, 2002, and $271,232.00 due on July 15, 2002. Because IGE failed to make these payments and failed to obtain what Western Union thought were necessary licenses, Western Union terminated the Agreement on July 16, 2002. (P00145 (Ex. CC), July 16, 2002 letter from Western Union to IGE.)

Three days later, on July 19, 2002, IGE filed this lawsuit against Western Union, asserting five separate causes of action. After Western Union moved to dismiss,

pointing out the Complaint's numerous deficiencies, IGE filed an Amended Complaint, asserting claims for breach of contract and intentional interference with the IBEX contract, which had been cancelled by IBEX following Western Union's termination of the Agreement. In paragraph 12 of Amended Complaint, IGE alleged that Western Union breached the Agreement in the following ways:

(a) WU failed and neglected to provide plaintiff with its SwiftPay Card Agreement and privacy policy in a timely manner, which precluded plaintiff from distributing its cards, since it could not provide customers with the Agreement and Policy, as required by the Agreement;

(b) WU delayed approving advertising and promotional material provided by IGE, which effectively prevented plaintiff from delivering its product to the public;

(c) WU, by its General Counsel, opined without basis that IGE was a "money transfer service" and was therefore required to obtain licenses from various states;

(d) WU failed to support IGE's program as required by the Agreement and admitted as much in a letter from its Senior Vice President and General Manager dated April 16, 2002; and

(e) WU failed to tell its Agents, at its business locations, that it had agreed to accept SwiftPay transmissions on behalf of IGE's customers, with the result that IGE customers were turned away from WU locations.

These breaches allegedly led IGE to default on its payments to Western Union, which in turn caused Western Union to terminate the Agreement. Plaintiff generally alleged that it sustained damages as a result of Western Union's breaches, including defaulting on other bills, and specifically alleged that it had lost in excess of $15 million due to the termination of its relationship with IBEX.

Western Union moved to dismiss the Amended Complaint and, on November 22, 2002, the Court dismissed IGE's intentional interference with contract claim. (Memorandum Decision and Order, November 22, 2002 (Ex. NN).) Western Union answered the Amended Complaint on December 10, 2002, and asserted a counterclaim for breach of contract because IGE: (1) failed to make payments to Western Union required under the Agreement; (2) refused to obtain necessary licenses to conducts its business; and (3) failed to provide a copy of the SwiftPay Agreement to its cardholders. (Answer ¶¶ 49–50, 56–63, 71.)

### 6. Western Union's Acceptance of Payments from IGE's Cardholders

IGE alleges that its customers experienced difficulty getting Western Union agents to accept and load IGE's SwiftPay cards. IGE witnesses testified that IGE's "product wasn't usable, no one could load it" (see, e.g., Bingler Tr. (Ex. Q), at 48:6–7). However, none of IGE's witnesses had contact with cardholders, nor had firsthand knowledge of any cardholder complaints. (Rossillo Tr. (Ex. G), at 180:23–181:2, 198:18–21, 199:7–12, 200:16–18 (admitting only secondhand knowledge of purported payment acceptance difficulties); Bingler Tr. (Ex. Q), at 49:22–50:6, 52:10–23 (same); IGE 30(b)(6) Tr. (Ex. E), at 106:17–107:4. Nor could anyone testify as to how often payment acceptance problems occurred, or what percentage of attempted payments were not accepted by Agents purportedly unable or refusing to accept cardholder funds. (Rossillo Tr. (Ex. G), at 181:3–6); Bingler Tr. (Ex. Q), at 48:9–22; 50:18–21).

IGE did produce some documents describing problems encountered by IGE

cardholders while making payments at Western Union agents. For purposes of Western Union's motion, I must draw all reasonable inferences in favor of IGE, so I will assume that IGE could authenticate these documents as business records under traditional evidentiary standards.[1] However, the documents reflect only sixty-four instances in which customers experienced any difficulty. Of those sixty-four instances, at least thirty were resolved. (*See*, P00147, 152, 156–57, 332–36, 338–39, 367, 377, 382, 385–387, 420, 426–28.) Forty-five of the sixty-four instances involved computer errors and system interface problems between IGE's and Western Union's systems, and not any purported refusal by an Agent or inability to load the funds.[2] Thirty-three of those forty-five instances do not even reflect payment issues, but instead reflect issues that did not prevent an Agent from accepting payment.[3]

Taking all of this into account, the documents show only eight instances where a cardholder purportedly asked an Agent to accept payment and the Agent was unable or unwilling and did not accept the funds. (P00148–50; 263, 265, 401–07, 421–222.) By contrast, funds were successfully loaded onto IGE cards over 2600 times. (Diveley Aff. ¶ 23, Ex. A, SwiftPay "Client 14 Month Summary," at 11.)

Western Union did take steps to make sure that IGE's cardholders would be able to make payments to IGE using SwiftPay. Every day for the first fourteen days that IGE's program began, and numerous time afterwards, Western Union sent messages or "screen shots" to Agents' terminals advising that UTA and IGE card transactions were to be processed using SwiftPay. (Drab Tr. (Ex. K), at 23:18–25:12; Drab Aff. ¶ 11; Diveley Tr. (Ex. H), at 93:25–

1. Western Union argues with force that IGE cannot qualify these documents as business records, because there is no evidence that they meet the requirements of Fed.R.Ev. 803(6). No one has been able to identify who created the documents or testify that they were created at or about the time of the matters recounted or by a person who was under a duty accurately to record the information contained therein. However, since the documentary evidence demonstrates that there were only an inconsequential number of times that transactions could not be completed—mostly for technical reasons—I will put that issue to one side.

2. The forty-five computer issues break down as follows: eighteen transactions had been properly accepted by an Agent, but a computer error prevented the load from properly registering in the computer system, resulting in a "no record found" message (P00158, 260, 266–67, 337–39, 367, 369–73, 375–76, 392–96, 426–28, 431, 477–78, 481, 483–87); seven transactions resulted in an error message of "account not on record" (P00389); two transactions involved programming glitches affecting account numbers (P00390–91, 337); five transactions involved funds that had been properly loaded by an Agent, but

after being loaded, the computer files were somehow dropped or missing (P00319, 440–41); eight transactions had been properly loaded but the loads were not reflected in the cardholders' accounts (P00156–57, P00338–39); one transaction resulted in an error message when the Agent entered the account number (P00399); one transaction displayed the wrong account holder's name on the computer screen (P00342–66); and one instance involved corrupted card numbers (P00382, 479–80).

3. These non-loading issue involved: a power outage (P00239); eighteen computer issues (discussed *supra*); an error on IGE's system (P00242); a cardholder who had not properly requested a SwiftPay transaction (P00420); two Agents properly loaded cards, but the funds were not available because the cardholders' name triggered Western Union's screening process for fraud or federal Office of Foreign Asset Control ("OFAC") issues (P00408, 458); three questions about the maximum amounts of funds that could be loaded onto the cards (P00340, 444, 483); confusion over a receipt (P00445); three questions relating to swiping the card (P00244, 339, 485); and duplicate cards (P00385–87, 390–91, 478–79).

95:4; Diveley Aff. ¶ 13; P00446–47, 452–54 (Ex. J), December 18 and 21, 2001 e-mail chains; WU2663–64, 2671–72 (Ex. I), screen messages.) Western Union also reminded IGE to tell its cardholders to ask the Agent to perform a SwiftPay transaction (as opposed to an "IGE deposit" or a "UTA deposit"). (Drab Tr. (Ex. K), at 23:18–25:12; Drab Aff. ¶ 11; Diveley Aff. ¶ 22; P00131 (Ex. EE), May 30, 2002, fax from M. Thompson to A. Bingler; P00491 (Ex. FF), June 5, 2002 e-mail chain; P00137–38 (Ex. U), June 6, 2002 letter from D. Mosher to P. Eisenberg.) In addition, Western Union used the monthly Agent magazine to indicate to Agents that IGE was a SwiftPay subscriber. (Drab Tr. (Ex. K), at 23:18–25:12; Drab Aff. ¶ 11; Diveley Aff. ¶ 12.) When IGE claimed there had been some instances where Agents had not accepted payments, Western Union set up a system with IGE so that any time IGE believed an Agent had failed to honor the agreement, IGE was to let Western Union know immediately and Western Union would address it within twenty-four to forty-eight hours. (Drab Tr. (Ex. K), at 23:18–25:12; Drab Aff. ¶ 11; Diveley Aff. ¶ 22.)

### 7. Western Union's Review of IGE's Advertising Materials

Under the Agreement, IGE could only use Western Union's trademarks, service marks, trade names or logos in advertising or promotional materials with Western Union's approval. (Agreement § 4.7.) Western Union also agreed, at its discretion, to assist IGE in developing advertising and marketing programs, "as Western Union deem[ed] advisable and appropriate in furtherance of this Agreement." (*Id.* § 8.1.)

Western Union has a formal review process for evaluating any third party's advertising or marketing materials that use Western Union's intellectual property, including review by the Marketing, Legal and Trademark Departments. (Drab Aff. ¶ 6.) Although IGE testified that there were "several months, two or three months before [the new advertising materials were] approved" (IGE 30(b)(6) Tr. (Ex. E) at 78:22–23), the evidence shows no such delay by Western Union. Instead, it shows that IGE submitted proposed marketing materials to Western Union on April 15, 2002 and submitted revised materials on April 25, and the materials were approved on May 3 and May 7.[4]

4. Specifically, the evidence shows:

1. On *April 15, 2002*, Pier Bjorklund of IGE wrote an e-mail to Western Union seeking approval of certain marketing materials. Although he claimed that he did not hear back from Western Union for over two weeks, he also indicated that Western Union had already gone over most of the items and that IGE had changed some of its materials, requiring a new review. (Drab Aff. ¶ 8; P00087 (Ex. GG), April 15, 2002 e-mail from P. Bjorklund to G. Gilbert.)

2. On *April 16, 2002*, Western Union responded, and then Bjorklund again indicated that certain IGE materials had changed and would need to be submitted for further review, and that IGE would not get additional materials to Western Union for review until more than another week later.

(Drab Aff. ¶ 8; P00100 (Ex. HH), April 16, 2002 e-mail from P. Bjorklund to B. Drab.)

3. On *April 25, 2002*, IGE indicated that it was providing Western Union with IGE's updated card and packaging for review by Western Union and that additional materials would be coming the next week. (Drab Aff. ¶ 9; P00114 (Ex. II), April 25, 2002 e-mail from P. Bjorklund to G. Gilbert.)

4. On *May 3, 2002*, Western Union *granted approval* of marketing materials when IGE indicated at the last minute that there was an urgent need for approval before a trade show the next day. (Drab Aff. ¶ 10; P00101 (Ex. JJ), May 7, 2002 e-mail from G. Gilbert to P. Bjorklund; P00111 (Ex. KK), May 3, 2002 e-mail from P. Bjorklund to G. Gilbert; P00113 (Ex. LL), May 6, 2002 e-mail from G. Gilbert to P. Bjorklund.)

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

Rule 56(c) provides that summary judgment shall be granted where there is no "genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law," that is, where the party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Thus, a party opposing summary judgment must point to "specific facts showing that there is a genuine issue for trial," by proffering "significant probative evidence tending to support [its] complaint." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citations omitted).

Evidence that is "merely colorable" or not "significantly probative" will not suffice to overcome a motion for summary judgment. *Anyan v. N.Y. Life Ins. Co.*, 192 F.Supp.2d 228, 238 (S.D.N.Y.2002) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510). Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion," and factual disputes that are "irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original).

Accordingly, a party opposing a summary judgment motion "may not rest upon the mere allegations or denials of [its] pleadings," Fed.R.Civ.P. 56(e), or upon "mere speculation or conjecture as to the true nature of the facts." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). The non-moving party "must present 'concrete particulars' and cannot succeed with purely conclusory allegations." *Anyan*, 192 F.Supp.2d at 237. In addition, the evidence supporting the position of the non-moving party also must be admissible at trial. *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (granting summary judgment); *Maier–Schule GMC, Inc. v. Gen. Motors Corp.*, 154 F.R.D. 47, 57–60 (W.D.N.Y.1994) (after surveying Second Circuit and other federal law, requiring admissible evidence to defeat summary judgment).

### II. WESTERN UNION IS ENTITLED TO SUMMARY JUDGMENT DISMISSING IGE'S BREACH OF CONTRACT CLAIM

The complaint charges Western Union with breaching its contract with IGE by terminating the parties' Agreement without cause.

■ To establish breach of contract under New York law, a plaintiff must show: (1) the existence of a valid contract; (2) performance of the contract by one party; (3) breach of the contract by the other party; and (4) damages sustained because of the breach. *R.H. Damon & Co., Inc. v. Softkey Software Prod., Inc.*, 811 F.Supp. 986, 991 (S.D.N.Y.1993).

5. On *May 7, 2002*, Western Union *granted approval* of the new card, packaging and marketing materials, subject to IGE's working out its legal compliance issue. (Drab Aff. ¶ 10; P00101 (Ex. JJ).) Western Union indicated it wanted to resolve the compliance issues before new materials using Western Union's name and marks were released. (*Id.;* WU3133–38 (Ex. T)), April 25, 2002 letter from M. subject to resolution of the compliance issues, IGE indicated that a week later it made a "massive distribution" of cards (WU 3367 (Ex. MM), May 29, 2002 e-mail from A. Bingler to M. Thompson)

There is no dispute that the parties had a valid contract. The issues raised by the motion are: (1) whether Western Union performed under the contract; (2) whether IGE breached the contract, so as to justify termination; and (3) whether IGE sustained recoverable damages due to the breach. I conclude that there is no genuine issue of material fact as to all three issues.

## A. Western Union Performed Under The Agreement

■ IGE alleges that Western Union breached the Agreement because its "agents were unable to or refused to accept payment from plaintiff's customers." (Am.Compl.¶ 12(e).) Nine months of discovery shows, however, that there were at most only a few instances when that occurred—an inconsequential number when compared to the number of successful transactions. IGE speculates that hundreds or even thousands of its customers "could" have experienced difficulties in this regard (*see* Ex. E at 105–108), but speculation is not evidence. The documentary evidence outlined above identifies only eight instances when Agents refused to deal with IGE cardholders, and another fifty-six instances when computer difficulty prevented the completion of a transaction.

■ IGE also offered testimonial evidence of purported loading difficulties. However, that evidence is plainly incompetent to raise a disputed issue of fact, since it is consists entirely of speculation and double, triple or even quadruple hearsay:

- According to IGE's corporate representative, IGE heard of cardholder payment concerns from card distributors (IGE 30(b)(6) Tr. (Ex. E), at 106:17–107:4), who purportedly learned of such issues from retail store owners that sold the cards, who purportedly learned about them from cardholders.

- According to IGE's General Counsel, she heard of payment concerns from IGE's CEO, who she assumes heard about them from IGE's Director of Customer Service (Bingler Tr. (Ex. Q), at 49:22–50:6), who presumably heard about them from customer service representatives, who presumably heard about them from customers.

- IGE's sales manager testified that he heard of payment acceptance concerns from distributors (Restrepo Tr. (Ex. RR), 64:18–65:11, 70:3–10; 77:14–25), who presumably heard about them from retail store owners that sold the cards, who presumably heard about them from customers.

- Philip Colasuonno, IGE's CFO and current CEO, testified that he heard of payment acceptance concerns from distributors, or through IGE employees who had had contact with distributors (Colasuonno Tr. (Ex. F), 105:14–107:3), who presumably heard about them from retailers, who presumably heard about them from customers.

In its reply papers, IGE is equally unsuccessful in proffering evidence of card dishonor by Western Union that rises to the level of a material breach. Karen Schoen, a former distributor of IGE's cards, claims in conclusory fashion to have first-hand knowledge of instances when Western Union agents refused to accept cardholder funds, but she offers no specifics about these instances—and most important, she does not say how many such instances there were. Philip Colasuonno avers that a company called "Prima"—a former Western Union agent—was never trained about SwiftPay; that testimony is rank hearsay. Alvarao Restrepo's testimony relied on by plaintiff is completely mischaracterized—Restrepo testifies that

he had personal knowledge about only one effort to load funds onto an IGE card at a Western Union outlet, and that effort was successful, not unsuccessful. Colasuonno says that the Western Union customer service department personally advised him that it did not know about SwiftPay or IGE, but he does not identify the person or persons he spoke with in the department. (Colasuonno Aff. at 5, 7–8.) This conclusory evidence is insufficient to raise a disputed issue of material breach.

I therefore consider only the documentary evidence in deciding whether IGE has raised a genuine issue of fact. It has not. No reasonable trier of fact could conclude from the documentary evidence that Western Union was in material breach of the Agreement. The number of documented instances of Western Union Agents' failing to accept payments was so insubstantial that it could not possibly have defeated the object of IGE and Western Union in making the Agreement. *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir.1997).

■■■ A breach of contract is material if it goes "to the root of the agreement between the parties" or "to the essence of the contract." The determination of the materiality of a breach is, of course, an issue of law for the Court. *Wechsler v. Hunt Health Systems, Ltd.,* 198 F.Supp.2d 508, 526 (S.D.N.Y.2002).

Assuming that Western Union was unable to complete sixty-four transactions, the fact that there were over 2600 successful IGE card transactions (Diveley Aff. Ex. A, SwiftPay "Client 14 Month Summary," at 11), indicate there is no material breach of contract. The relatively small number of problems with IGE cards documented in the evidence simply does not rise to the level of a material breach. *See September-tide Publ'g, B.V. v. Stein & Day, Inc.,* 884 F.2d 675, 678–79 (2d Cir.1989) (perform-

ance of only 67% of contractual obligation not so substantial as to defeat object of parties in making contract). Indeed, any such conclusion would run contrary to the expressed intention of the parties. Sections 5.6 and 7.6 of the Agreement contain reciprocal disclaimers of warranties with respect to the services provided by both parties. These warranty disclaimers are unambiguous and enforceable under New York law. *See Elgie & Co. v. Int'l Terminal Operating Co.,* 599 F.2d 1177, 1183 (2d Cir.1979) (upholding a warranty disclaimer) (citations omitted). They fairly imply that the parties did not intend to set up an impossible standard of perfect performance, and eviscerate IGE's assertion that even a single unsuccessful transaction or refusal to honor would establish a breach of contract by Western Union (Ex. E at 115–16)—a position that is, in any event, patently ridiculous and without merit as a matter of law.

The undisputed evidence shows that Western Union addressed questions raised by IGE as IGE's program began and the computer systems were integrated and cardholders began using the product. The small number of recorded customer service issues is unexceptional—and therefore immaterial as a matter of law.

■■ IGE also alleges that Western Union was in breach of the Agreement because Western Union delayed approving advertising and promotional materials. (Am.Compl.¶ 12(b).) According to IGE, its claim is that packaging for its new card was to come out in the spring of 2002, but Western Union delayed approval in April 2002. (IGE 30(b)(6) Tr. (Ex. E), at 78:9–79:11.)

As noted above, the evidence does not bear out IGE's allegation. It is undisputed that Western Union reviewed the submitted items (P00087 (Ex. GG)), and that

the materials were approved. (IGE 30(b)(6) Tr. (Ex. E), at 79:10–11; 109:24–110:3.) Although IGE testified that there were "several months, two or three months before [the new advertising materials were] approved" (IGE 30(b)(6) Tr. (Ex. E), at 78:22–23), Western Union in fact granted approval on May 7, 2002, of materials submitted between April 16 through April 25, 2002. (P00174 (Ex. SS), May 7, 2002 e-mail from M. Thompson to A. Bingler, P00088 (Ex. GG), May 7, 2002 e-mail from G. Gilbert to P. Bjorklund.) Western Union even granted approval of a last-minute request by IGE when IGE indicated an urgent need for approval before a trade show the next day. (Drab Aff. ¶ 10; P00101 (Ex. JJ), May 7, 2002 e-mail from G. Gilbert to P. Bjorklund; P00111 (Ex. KK), May 3, 2002 e-mail from P. Bjorklund to G. Gilbert; P00113 (Ex. LL), May 6, 2002 e-mail from G. Gilbert to P. Bjorklund.)

Moreover, the Agreement did not set forth any time limit on Western Union's review of advertising materials submitted to it, or any schedule or deadline by which Western Union had to complete its review process. (Agreement §§ 4.7, 6.4, 8.1.) Ordinary contractual principles of good faith and fair dealing would suggest that Western Union was not free to sit on submitted materials forever, but given the fact that Western Union reserved the right to approve advertising using its logo in order to "protect[ ] the valuable intellectual property rights." *Bellino Schwartz Padob Adver., Inc. v. Solaris Mktg. Group, Inc.,* 222 A.D.2d 313, 314, 635 N.Y.S.2d 587, 588 (1st Dep't 1995), it is hardly unreasonable for advertising review to take a certain amount of time. The few weeks that the evidence indicates it took for the review to be completed is a far cry from anything that would violate the duty of good faith or fair dealing.

In response to the motion, IGE proffers the affidavit of its CEO, Colasuonno, in which he avers that Western Union employee Robert Drab, Vice President for Pre-Paid Services said something at a meeting that caused him to infer that Western Union would only approve IGE's marketing materials if IGE changed its program from a two-card set to a one-card set. (Colasuonno Aff. ¶ 10.) Not only is Colasuonno's statement not evidence of what actually happened when real advertising materials were actually submitted for review, it is utterly speculative, and possibly even hearsay.

Finally, even if Western Union had delayed approving IGE's materials, and even if such delay breached the Agreement, there is no evidence in the record before this Court that IGE was harmed in any way by the delay. IGE did not even have a distributor for the cards from November 16, 2001, when UTA cancelled its arrangement with IGE, until early April 2002, when it signed the contract with IBEX. Shortly after the IBEX contract was signed, IGE submitted the materials to Western Union for approval (on April 16)—and they were approved within a matter of weeks. So it is impossible to see how any damages could have been sustained. Certainly none have been proved.

In the complaint, IGE also asserted that Western Union failed to provide IGE with copies of the SwiftPay Card Agreement and Privacy Policy in a timely manner, so they could be sent out with purchased cards. (Am.Compl.¶ 12(a).) At his deposition, taken pursuant to Rule 30(b)(6), IGE's corporate representative, Phillip Colasuonno, admitted that IGE was not contending that this constituted a breach of the Agreement by Western Union. Rather, IGE intended this assertion as "a rebuttal to Western Union's allegation that we did not insert them" into the card

packaging, as required under Section 4.2 of the Agreement. (Colasuonno Tr., at 74:5–8.) IGE cannot retract that testimony in opposing Western Union's motion. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment"). In any event, IGE submits no evidence to support this assertion; in particular, IGE's Rule 56.1 Statement on this point (¶¶ 82–84) does not cite to a single piece of evidence that Western Union did not provide this documentation to IGE, which means that those Rule 56.1 allegations do not comply with the Local Rules of this Court and I must ignore them. *See Stone v. 866 3rd Next Generation Hotel, L.L.C.*, No. 99Civ.4780, 2002 WL 482558, at *1 n. 2 (S.D.N.Y. Mar. 29, 2002) (denying summary judgment motion for failure to comply with Local Rule 56.1); *Frank v. Plaza Constr. Corp.*, 186 F.Supp.2d 420, 432 (S.D.N.Y.2002) (same).

## B. IGE Breached the Agreement By Failing to Make Payments to Western Union As Required Under the Agreement

While the evidence does not show that Western Union materially breached the Agreement, it indisputably shows that IGE did.

■ First, there is no question that IGE failed to make minimum payments under the Agreement of $272,756.00 on June 15, 2002, and $271,232.00 on July 15, 2002. (Reply ¶¶ 20–23.) IGE's defense to its non-payment—that is was privileged to withhold payment because of material breaches by Western Union that made it impossible for IGE to perform—fails be- cause, on the non-conclusory and undisputed facts in this record (discussed above), there were no such breaches.

■ Second, IGE breached the Agreement by failing to comply with applicable laws. It represented and warranted to Western Union that no authorization or approval or other action by governmental authority or regulating body was required for IGE to perform under the Agreement (Agreement § 5.4.), and agreed to "comply in all material respects with all banking and consumer protection laws and regulations . . . ." (*Id.* § 4.9.) On the undisputed evidence in this record, IGE was in breach because it was not in compliance with such laws and took no steps to bring itself into compliance.

Under both state and federal law, to accept or hold money from consumers in a non-agency capacity requires some form of licensing. Licensing protects consumers by requiring the entity to, for example: (1) register and file periodic reports with regulatory agencies; (2) maintain minimum bonds or levels of capital and/or post bonds or other securities to protect consumers in the event of loss; (3) restrict investment of customer funds to liquid and highly rated investments; (4) provide notice or receive advance approval of any change in control of the licensed entity; and (5) submit to inspection by regulators to examine compliance with laws and the safety and soundness of the businesses' operations and financial condition.[5]

Most states, including New York, require a license for "receiving deposits" or "engag[ing] in the business of receiving money or transmitting the same." NEW YORK BANKING LAW §§ 131(1) and 641

---

5. *See* Judith Rinearson, *Regulation of Electronic Stored Value Payment Products Issued by Non–Banks Under State 'Money Transmit- ter' Licensing*, 58 Business Lawyer 317, 321– 22 (November, 2002) (Ex. XX).

(McKinney 2003).[6] Examples of other states with such licensing requirement include eighteen states that define "money transmission" very similarly to New York.[7] Several states also include "stored value" within the definition of "money transmission," often defining stored value as "monetary value that is evidenced by an electronic record." [8] In addition, many states require a license for the sale of "payment instruments," in some cases specifically defining "payment instruments" to include a "card or other tangible object for the transmission or payment of money." [9]

**6.** *See* Rinearson, *supra* n. 13.

**7.** Nine of those states define money transmission as "engaging in the business of receiving money for transmission or transmitting money". Colo. Rev. Stat. Ann. §§ 12–52–103, 12–52–104 (West 2003); Conn. Gen. Stat. Ann. §§ 36a–596, 36a–597 (West 2003); Ga. Code Ann. §§ 7–1–680, 7–1–681 (2003); D.C. Code Ann. §§ 26–1001(10); 26–1002 (2003) Ind. Code Ann. §§ 28–8–4–13, 28–8–4–20 (West 2003); Me. Rev. Stat. Ann. tit. 32, §§ 6102, 6103 (West 2003); Minn. Stat. §§ 53B.02; 53B.03, Subd. 13 (2001); N.J. Stat. Ann. §§ 17:15C–2, 17:15C–4 (West 2003); Or. Rev. Stat. §§ 717.200, 717.205 (2001); Tenn. Code Ann. §§ 45–7–202, 45–7–203 (2003). Six of these eighteen states define "money transmission" as engaging in the business of receiving money or monetary value for transmission. La. Rev. Stat. Ann. §§ 1032, 1033 (West 2002); Md. Code Ann., Financial Institutions, §§ 12–401(1)(1); 12–405 (2002); N.C. Gen. Stat. §§ 53–208.2(11); 53–208.3 (2003); Va. Code Ann. §§ 6.1–370, 6.1–375 (Michie 2003); Vt. Stat. Ann. tit. 8, §§ 2500(11); 2502(a) (2002); Wyo. Stat. Ann. §§ 40–22–102, 40–22–103 (Michie 2003). The three remaining states also require a license for this business, with only slightly differing definitions of "money transmission." Idaho Code §§ 26–2902, 26–2903 (Michie 2003) ("engaging in the business of receiving money for transmission or the business of transmitting money"); Wash. Rev. Code Ann. §§ 19.230.010, 19.230.030 (West 2003) (engaging in the business of "receiving money to transmit") W. Va. Code §§ 32A–2–1(6); 32A–2–2(a) (2001) ("engaging in the business of . . . receiving currency or the payment of money by any means for the purpose of transmitting that currency, payment of money or its equivalent").

**8.** *See, e.g.*, N.C. Gen. Stat. §§ 53–208.2(11), (38); 53–208.3 (2003) (license required for monetary transmission including the "sale or issuance of . . . stored value," defined as "monetary value that is evidenced by an elec-

tronic record"); Va. Code Ann. § 6.1–370 (Michie 2003) (license required for transmission including "selling or issuing stored value," defined as "monetary value that is evidenced by an electronic record"); Vt. Stat. Ann. tit. 8, §§ 2500(11), (19); 2502(a) (2002) (license required for money transmission including "selling or issuing . . . stored value," defined as "monetary value that is evidenced by an electronic record"); *see also* La. Rev. Stat. Ann. § 6:1033 (West 2001) (license required for "money transmission" including "selling or issuing stored value"); W. Va. Code § 32A–2–1(6); 32A–2–2(a) (2001) (license required for transmission including "the transmission of funds through the issuance and sale of stored value cards which are intended for general acceptance and used in commercial or consumer transactions").

**9.** *See, e.g.*, Minn. Stat. §§ 53B.02; 53B.03, Subd. 13 (2001) (license required to sell "payment instrument" including an "electronic instrument," defined as a "card or other tangible object for the transmission or payment of money"); N.C. Gen. Stat. §§ 53–208.2(6), (14); 53–208.3 (2003) (license required to sell "payment instrument" including an "electronic or written instrument" and "electronic instrument" is defined as "[a] card or other tangible object for the transmission or payment of money or monetary value"); Or. Rev Stat. §§ 717.200(7), (12); 717.205 (2002) (license required to sell "payment instrument" including an "electronic instrument," defined as "a card or other tangible object for the transmission or payment of money"); *see also* Fla. Stat. §§ 560.103(14); 560.204 (2002) (license required to sell "payment instrument," defined as a "check, draft warrant, money order, travelers check or other instrument or payment of money"); Vt. Stat. Ann. tit. 8, §§ 2500(13); 2502(a) (2002) (license required to sell "payment instrument," defined as "a check, draft, money order, traveler's check, or other instrument for the transmission or payment of money or monetary value").

Moreover, the Glass Steagall Act precludes any institution other than a state-licensed money transmitter or a state or national bank from engaging in "the business of receiving deposits subject to repayment ... upon request of the debtor." 12 U.S.C. § 378(A)(12).

The New York State Banking Department recently addressed licensing issues in connection with the payment service offered by a company called PayPal, Inc. ("PayPal"). PayPal offers a payment service for the sale of goods and services over the Internet. In essence, PayPal serves as a middleman between buyers and sellers, allowing transactions to take place without the parties exchanging checks or credit card information. The buyer provides funds to PayPal, and PayPal in turn provides funds to the seller. The arrangement is virtually indistinguishable from IGE's arrangement with purchasers of its cards.

Under PayPal's original business model, when PayPal received funds from a buyer to be provided to a seller, the seller could choose among three options: (1) PayPal would deposit the funds into a bank account belonging to the seller; (2) PayPal would send the seller a check in the amount of the funds; or (3) PayPal would keep the "monies on account so that [the seller] may use the balance to send those monies to others." (July 18, 2000 New York State Banking Department Legal Opinion (Ex. UU).)

The New York State Banking Department indicated in a letter to PayPal that, with respect to the third option, PayPal's keeping money "on account for future use constitutes illegal banking." (*Id.*) In addition, California, Idaho and Louisiana all initiated investigations into whether PayPal needed to be licensed, also based on the fact that customers' funds were held in a bank account in PayPal's name. *See* Carl Kaminski, *Online Peer-to-Peer Payments: PayPal Primes the Pump, Will Banks Follow,* 7 N.C. BANKING INST. 375, 380–81 (Apr.2003) (Ex. VV).

In response, PayPal altered its business model. Instead of holding its customers' funds for future use in a bank account in PayPal's name, PayPal offered to place the funds in a "bank account denominated, 'PayPal, Inc., as agent for the benefit of its customers,' at one or more FDIC-insured banks ("FBO Account")." (June 3, 2002 Legal Opinion (Ex. TT).) Only after PayPal made this change did the Banking Department indicate that PayPal was no longer engaged in illegal banking under New York law. (*Id.*)[10]

There is no dispute that IGE was in the business of depositing cardholders' funds

---

**10.** Nonetheless, the Banking Department still strongly suggested that PayPal obtain a money transmission license "as soon as practicable" because it was "offering payment services to New York customers without being subject to supervision by a national or New York regulatory body." (*Id.*) PayPal indicated it was in the process of obtaining such a license (*id.*) and also obtained money transmitter licenses in California, Idaho, Louisiana and sixteen other states. *See* R. Stephensen et al., *Developments in Cyberbanking,* 58 Bus. Law. 1215, 1228 (May 2003) (Ex. WW.) As noted above, officials in California, Idaho and Louisiana initiated investigations into whether PayPal needed to be licensed to retain customers' funds in PayPal's account at a bank. Ultimately, these states were satisfied when PayPal agreed to comply with the licensing requirements for money transmitters in those states. *See* Kaminski at 385–87. In addition, a card program similar to IGE's was found to require licensing under Florida law. Florida State University ("FSU") had a program called the Seminole Access Card that allowed students to deposit funds which they could then access to make purchases at various locations and at certain bank ATMs. The Florida Comptroller's Office concluded that FSU needed a license to conduct such activity. (Comptroller of Florida, Seminole Access System Opinion (Ex. FFF).)

into its non-trust account at First Banks, and that the funds were received and held so they could ultimately be transmitted to the merchants or ATM owners where the cardholders used their cards. (*See supra* 8–9.) The Agreement between IGE and Western Union provides that the cardholders' funds are to be "credited to an IGE account at a bank." (Agreement p. 1 ¶ C.) The account into which those funds were deposited was in IGE's name alone, and not in the name of IGE "as agent for the benefit of its customers." (First Bank Signature Cards (Ex. X); P02791 (Ex. D), Cardholder Agreement and Disclosure). Furthermore, IGE's cardholder agreement explicitly provided that IGE was not acting as the customer's agent. (P02791 (Ex. D).) There is no dispute that only IGE, and no other party, had title to the funds in the account. (*Id.*) While certain customer funds were ultimately moved from IGE's account at First Bank to a settlement account belonging to First Bank, there is no dispute that the customers' funds were received into IGE's checking account and remained in that account for months at a time, not in trust and not subject to any agency agreement. This put the cardholders' funds at risk.[11] (Phelps Tr. (Ex. CCC), at 110–115; First Bank Account Statement, "IGE/FDR Transaction Settlement" (Ex. EEE).)

Thus, IGE received and held customers' funds for future use by the customers—the type of conduct addressed by New York Banking Law Sections 131 and 641 and the laws of other jurisdictions. Because IGE was not licensed to receive and hold funds in any state, IGE was in breach of the Agreement.

IGE's refusal to comply with applicable laws also raised serious criminal law con-

cerns. Failing to obtain necessary licensing under Section 641 is a crime under New York law. "Any person who ... (1) engages in the business of receiving money for transmission ... without a license therefore ... shall be guilty of a Class A misdemeanor." NEW YORK BANKING LAW § 651(2)(a) (McKinney 2003). Federal law also criminalizes money transmission without a license. Under 18 U.S.C. Section 1960, "whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicenced money transmitter business, shall be fined in accordance with this title or imprisoned not more than 5 years or both."

IGE was aware of these regulatory and criminal concerns. For one thing, Western Union repeatedly provided IGE with information regarding the laws at issue, including all of the state money transmitter laws, and specific examples of laws and cases that were applicable. For another, IGE's own lawyers made plaintiff aware of the issues. (*see supra.*, at 9–10.)

Nonetheless, IGE refused to obtain licensing in New York or any other state. Western Union gave IGE 30 days' notice to cure its breach, as provided in the Contract. (WU 3242 (Ex. YY), April 16, 2002 letter from K. Diveley to IGE.) Under Section 12.2 of the Agreement, the burden was on IGE to "deliver evidence" of its compliance to Western Union, (Agreement § 12.2.). IGE never did so. Therefore, Western Union was privileged to terminate the Agreement.

## C. The Damages IGE Seeks Are Not Recoverable

 Finally, Western Union contends that plaintiff's breach of contract claim

---

11. For example, if IGE had filed for bankruptcy or become subject to an asset freeze on July 17, 2002, more than $60,000.00 of cardholders' funds would have been held in IGE's account at First Bank and at risk. (*See supra* p. 9.)

must be dismissed because it cannot demonstrate that any damages were sustained because of any breach.

 Assuming arguendo that IGE had demonstrated a material breach of contract on Western Union's part, it could not recover unless it quantified and substantiated its allegation of damages sustained as a result of the defendant's breach in specific, non-speculative terms. *See Amer. Home Prods. Corp. v. CAMBR Co.*, 00 Civ.2021, 2001 WL 79903, at *4 (S.D.N.Y. Jan. 30, 2001). Courts grant summary judgment dismissing a breach of contract claim where plaintiff has put forth no evidence of damages that are recoverable under New York law. *See, e.g., New Paradigm Software Corp. v. New Era of Networks, Inc.*, No. 99 Civ. 12409, 2002 WL 31749396, at *17 (S.D.N.Y. Dec. 9, 2002); *Pay Tel Sys., Inc. v. Seiscor Techs., Inc.*, 850 F.Supp. 276, 279 (S.D.N.Y.1994).

Throughout this litigation, IGE has principally claimed damages of $15,000,000 per year for three years, which it says it would have received pursuant to its distribution contract with IBEX—a third party—if Western Union had not breached the Agreement. (Am.Compl.¶ 16.) In its response to Western Union's motion, IGE claims that it has been unable to pay trade bills of $5 million—including $1.4 million that IGE allegedly owes to IBEX—and it seeks $1.4 million in damages to cover what it owes IBEX. However, the amount of IGE's outstanding trade bills, whether to IBEX or to anyone else, is simply one component of IGE's alleged lost earnings (since trade bills are paid out of earnings), so the addition of this "claim" does not alter the relevant analysis.

IBEX's claim for lost earnings is barred by the terms of the parties' contract. The Agreement, however, explicitly disallows liability for "any special, indirect, incidental or consequential losses or damages." (Agreement § 10.2.) Courts regularly enforce contractual provisions excluding recovery of such damages. *See, e.g., Betal Envtl. Corp. v. Local Union No. 78, Asbestos, Lead & Hazardous Waste Laborers*, 162 F.Supp.2d 246, 260 (S.D.N.Y.2001) (where unambiguous provision in a contract excluded recovery of consequential damages, defendant had no liability for such damages); *DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 317–18 (S.D.N.Y.2002) (dismissing claim for consequential damages where excluded by terms of contract).

IGE's claim fails because a purported loss of income from a contract with a third party is precisely the type of damages that Western Union and IGE agreed in Section 10 of the Agreement are not recoverable. Lost earnings are, of course, a component of lost profits (lost profits being calculated as lost earning less trade debts, taxes and interest), and lost profits from a business venture are a prime example of consequential or special damages. *See, e.g., EPN Ingenieria S.A. De C.V. v. Gen. Elec. Co.*, No. 92 Civ. 1563, 1996 WL 531867, at *2 n. 4 (S.D.N.Y. Sept. 19, 1996) (granting summary judgment dismissing claim for lost profits, noting that lost profits are special damages). Indeed, this Court observed as long ago as November 22, 2002, "that the Agreement's bar against the recovery of 'special, indirect, incidental or consequential damages' ... forecloses IGE from forcing [Western Union] to pay the anticipated fruits of its arrangement with IBEX." (Memorandum Decision and Order, November 22, 2002, (Ex. NN) at 4–5.) Despite that ruling, IGE litigated this case through discovery without identifying any other damages it suffered. Indeed, it repeatedly reaffirmed that the only damages it was seeking were the profits it claims it would have earned under the IBEX contract.

In IGE's initial disclosures pursuant to Rule 26, in disclosing "any category of damages claimed by the plaintiff," IGE stated that its damages were "based upon its exclusive distributor, Ibex [sic], selling twenty-five percent (25%) of the cards which the contract contemplated." (Civil Case FRCP Rule 26(a) Initial Disclosures, dated November 15, 2002 (Ex. OO), at 3.)

In IGE's response to Western Union's document request seeking "all documents concerning Plaintiff's alleged damages," IGE's only response was that "if the terms of its distributor agreement with IBEX ... were in full force and effect for the contractually agreed upon three (3) year period of time, Plaintiff would have incurred damages in an amount exceeding the sum of $15,000,000.00, which is inclusive of residual income...." (IGE's Response to Western Union Financial Services, Inc.'s First Set of Document Requests Dated March 7, 2003, dated April 5, 2003 (Ex. PP), at 5.)

At his deposition, Colasuonno, on behalf of IGE, also affirmed that "the damages that IGE is seeking in this case are the amount of money that IGE claims it lost because it was not able to sell those cards to IBEX." (Colasuonno Tr. at 157:18–22; *see also* Rossillo Tr. (Ex. G), at 218:13–219:24 (testifying that IGE is seeking damages based upon revenues expected from the IBEX Contract); Colasuonno Tr. (Ex. F), at 70:2–21 (testifying that the source of damages is a claimed $6 fee IBEX would have paid per card to IGE).)

The New York Court of Appeals has established a stringent three-part test for whether a party can recover lost profits (and by extension, the lost earnings on which the calculation of those profits are based). One absolute element is that, at the time the contract was made, the parties must have contemplated that such damages could be awarded. *Kenford Co.*

*v. County of Erie,* 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131, 132 (1986). *See also Zink v. Mark Goodson Prods., Inc.,* 261 A.D.2d 105, 689 N.Y.S.2d 87, 88 (1st Dep't 1999) (granting summary judgment dismissing claim for lost profits as too speculative). In this case, IGE is out of the box simply because the contract is clear—the parties did not contemplate that consequential or special damages could be awarded. Therefore, summary judgment is appropriate. *Schonfeld v. Hilliard,* 218 F.3d 164, 175 (2d Cir.2000); *EPN Ingenieria,* 1996 WL 531867, at *2 (granting summary judgment where plaintiff produced no evidence that parties had contemplated liability for lost profits).

The case plaintiff cites to support his cause—*American List Corporation v. U.S. News & World Report, Inc.,* 75 N.Y.2d 38, 42–45, 550 N.Y.S.2d 590, 549 N.E.2d 1161 (1989)—has no bearing on this analysis. In *American List,* the damages claimed were the amounts that defendant U.S. News had agreed to pay to American List for defendant's acquisition of lists of college students' names. They were the fruits of the contract that was allegedly breached by U.S. News. In this case, the fruits of the contract between IGE and Western Union are (1) payment by IGE to Western Union, and (2) the provision of services from Western Union to IGE. The fruits of IGE's separate contract with IBEX—which was not a party to the IGE–Western Union contract—do not flow as a natural and probable cause of Western Union's alleged breach of a wholly separate contract between IGE and Western Union. Therefore, they qualify as consequential or special damages and are not recoverable.

## CONCLUSION

Defendant Western Union's motion for summary judgment is granted. The Clerk

of the Court is directed to enter judgment dismissing the complaint with prejudice and with costs to defendant. This constitutes the decision and order of the Court.